ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL VI

| | | |
|---|---|---|
| NOEL ROBERTO OPPENHEIMER GARCÍA, DAMARIS PIÑÁN<br><br>Parte Apelante<br><br>v.<br><br>YAUCO HEALTHCARE CORPORATION h/n/c HOSPITAL PAVIA YAUCO t/c/c HOSPITAL METROPOLITANO TITO MATTEI, CORPORACION DE SALA DE EMERGENCIAS ABC, ASEGURADORA XYZ, FULANO DE TAL, SUTANA DE TAL<br><br>Parte Apelada | TA2026AP00080 | *Apelación,* procedente del Tribunal de Primera Instancia, Sala Superior de Ponce<br><br>Caso Núm.: PO2022CV03024<br><br>Sala: 605<br><br>Sobre: Daños y Otras |

Panel integrado por su presidenta, la Jueza Romero García, el Juez Monge Gómez y la Jueza Prats Palerm.[1]

Monge Gómez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 10 de junio de 2026.

Compareció ante este Tribunal la parte apelante, el Sr. Noel Roberto Oppenheimer García (en adelante, "señor Oppenheimer García") y la Sra. Damaris Piñán (en adelante, "señora Piñán) (en adelante y en conjunto, "Apelantes"), mediante recurso de apelación presentado el 22 de enero de 2026. Nos solicitaron la revocación de la *Sentencia* emitida y notificada por el Tribunal de Primera Instancia, Sala Superior de Ponce (en adelante, "TPI"), el 22 de diciembre de 2025. Mediante el referido dictamen, el foro de instancia desestimó la "**Demanda**" incoada por los Apelantes y, en consecuencia, declaró "Ha Lugar" la "**Solicitud de Desestimación**" presentada por Yauco Healthcare Corp. h/n/c Hospital Pavía Yauco (en

---

[1] De conformidad con la OATA-26-0045, se designó a la Hon. Giselle Romero García, en sustitución del Hon. Felipe Rivera Colón, toda vez que este último dejó de ejercer funciones como juez de apelaciones, efectivo el 4 de mayo de 2026.

adelante, "Hospital" o "Apelado"), al amparo de la Regla 39.2 (c) de las de Procedimiento Civil, 32 LPRA Ap. V., R. 39.2 (c).

Por los fundamentos que expondremos a continuación, se *revoca* la *Sentencia* apelada.

## I.

El caso ante nos tuvo su génesis el 2 de noviembre de 2022, cuando los Apelantes presentaron una "**Demanda**" en contra del Hospital y otros codemandados de nombres desconocidos sobre daños y perjuicios, responsabilidad vicaria y daños emocionales. Mediante la misma, expresaron que el 6 de noviembre de 2021, el señor Oppenheimer García acudió a la sala de emergencias del Hospital y posteriormente fue admitido al área de salud conductual de dicha institución. Alegaron que, durante horas de la madrugada del sábado, 7 de noviembre de 2021, el señor Oppenheimer García sintió deseos de ir al baño; sin embargo, no disponía de un urinal portátil, bastón, silla de ruedas ni de medios para solicitar asistencia del personal de enfermería. Manifestaron que, debido a lo anterior, el señor Oppenheimer García se levantó solo y se dirigió hacia el baño.

Asimismo, indicaron que, no pudo abrir la puerta, lo cual provocó que perdiera el balance y cayera al suelo. Detallaron que, como resultado, recibió golpes en la cabeza y en la espalda y se mutiló el tercer dedo de la mano izquierda. Expresaron que, tras recibir atención de emergencia, no fue hasta el 9 de noviembre de 2021, que fue atendido por un cirujano de la mencionada institución hospitalaria. En vista de lo anterior, adujeron que el Hospital fue negligente al no proveer los cuidados de seguridad necesaria para pacientes con diagnósticos de esquizofrenia y problemas de movilidad. Además, alegaron que no le proveyeron un servicio de cirugía a tiempo o, en su defecto, no lo trasladaron a una institución hospitalaria que proveyera la atención médica adecuada y/o necesaria.

Posteriormente, el 22 de diciembre de 2022, el Hospital presentó su "**Contestación a Demanda**" mediante la cual rechazó la mayoría de las alegaciones expuestas en su contra y aclaró que el cuidado y tratamiento

médico ofrecido por el Hospital se ajustó a los estándares de la mejor práctica de medicina y servicios sanitarios. Añadió que, cualquier daño sufrido se debió a la propia negligencia del señor Oppenheimer García. Por último, sostuvo que no existe una relación causal entre el daño sufrido y el alegado acto u omisión del Hospital, sus empleados, contratistas o agentes.

Luego de diversas incidencias procesales impertinentes a la controversia de autos, el 12 de marzo de 2024, el Hospital presentó una "**Moción *In Limine***" en la cual indicó que, la Sra. Yadira Regueira Álvarez (en adelante, "señora Regueira Álvarez"), perito anunciado por los Apelantes, tenía falta de conocimiento, experiencia, adiestramiento o especialidad en materia de la unidad de salud mental. Igualmente, señaló que la señora Regueira Álvarez no emitió opinión alguna sobre ciertos hechos alegados en la "**Demanda**", los cuales son esenciales para probar la causa de acción. En sintonía con ello, le solicitó al Tribunal que declarara "Ha Lugar" su petición y, en consecuencia, excluyera el testimonio de la señora Regueira Álvarez como perito de los Apelantes. En su alternativa, solicitó que, de permitirse el testimonio durante el juicio, no se le autorice declarar sobre las materias de salud mental y manejo de enfermería en unidades de salud mental.

Transcurrido el término sin la postura de los Apelantes, el 1 de abril de 2024,[2] el TPI emitió una *Resolución* en la cual autorizó el testimonio de la señora Regueira Álvarez en juicio. No obstante lo anterior, restringió el alcance de su declaración al determinar que ésta no podrá testificar sobre "materia de salud mental y sobre materia relacionada al manejo de enfermería en unidades de salud mental, por estar fuera de su experiencia, conocimiento, destrezas o adiestramiento".[3]

Así las cosas, se celebró el juicio en su fondo los días 8 y 9 de diciembre de 2025. Durante dicha audiencia, la prueba documental de los Apelantes descansó en el Exhibit I Estipulado, consistente de la copia certificada del récord médico del señor Oppenheimer García en el Hospital

---

[2] Notificada el 5 de abril de 2024.
[3] *Véase*, SUMAC-TPI, entrada núm. 59.

por los servicios provistos del 4 al 6 de noviembre de 2021 y de los testimonios del señor Oppenheimer García, la señora Piñán y la señora Regueira Álvarez.

Una vez finalizada la presentación de la prueba por parte de los Apelantes, el Hospital presentó una solicitud de desestimación, al amparo de la Regla 39.2(c) de Procedimiento Civil, 32 LPRA, Ap. V, R. 39.2 (c). Empero, el foro primario se reservó el fallo y ordenó la continuación de los procedimientos. Así las cosas, los Apelados presentaron el testimonio del Sr. McGuinty, Jr., quien fue cualificado como perito en administración de hospitales. La única prueba documental desfilada por el Hospital fue el *curriculum vitae* de su perito.

Tras analizar la prueba presentada, el 22 de diciembre de 2025, el foro *a quo* dictó *Sentencia* declarando "Ha Lugar" la petición desestimatoria presentada por el Hospital. En particular, concluyó que los Apelantes no presentaron prueba pericial admisible sobre los siguientes aspectos: (1) el plan de cuidado, la supervisión y la seguridad requerida en una unidad de salud mental para un paciente con las circunstancias particulares del señor Oppenheimer García y (2) el estándar de la mejor práctica de la medicina o de la enfermería aplicable.

En desacuerdo con la referida determinación, los Apelantes acudieron ante este Tribunal mediante el recurso de epígrafe, en el cual señalaron el siguiente error:

> ERRÓ EL TRIBUNAL DE INSTANCIA AL DICTAR SENTENCIA FINAL DECLARANDO HA LUGAR LA DESESTIMACIÓN SOLICITADA POR EL HOSPITAL PAVÍA YAUCO AL AMPARO DE LA REGLA 39.2 c DE LAS REGLAS DE PROCEDIMIENTO CIVIL A PESAR DE QUE LA PRUEBA DESFILADA SOBRE LA CULPA O NEGLIGENCIA DEL HOSPITAL JUSTIFICABA UN REMEDIO EN LEY.

El 10 de junio de 2026, el Hospital presentó una "**Moción en Cumplimiento de Resolución**" mediante la cual se reiteró en los planteamientos esgrimidos en el "**Alegato de la Parte Apelada**" presentado el 27 de febrero de 2026.

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II.**

**A.**

El Artículo 1536 del Código Civil de 2020, dispone en su parte pertinente, que "[la] persona que por culpa o negligencia causa daño a otra, viene obligada a repararlo". 31 LPRA sec. 10801. En cuanto a este precepto y su aplicación, se ha establecido que sólo procede la reparación de un daño cuando se demuestren los siguientes elementos indispensables: (1) el acto u omisión culposa o negligente; (2) la relación causal entre el acto u omisión culposa o negligente y el daño ocasionado; y (3) el daño real causado al reclamante. Inmobiliaria Baleares, LLC y otros v. Benabe González y otros, 214 DPR 1109 (2024); Nieves Díaz v. González Massas, 178 DPR 820, 843 (2010).

En particular, el concepto de daños ha sido definido como "todo menoscabo material o moral causado contraviniendo una norma jurídica, que sufre una persona y del cual haya de responder otra". López v. Porrata Doria, 169 DPR 135, 151 (2006). En esa misma línea doctrinal, se ha establecido que la culpa o negligencia es la falta del debido cuidado que consiste en no anticipar y prever las consecuencias racionales de un acto o la omisión de un acto, que una persona prudente y razonable habría previsto en las mismas circunstancias. Nieves Díaz v. González Massas, *supra*, pág. 844; Rivera v. S.L.G. Díaz, 165 DPR 408, 421 (2005); Toro Aponte v. E.L.A., 142 DPR 464, 473 (1997); Ramos v. Carlo, 85 DPR 353, 358 (1962). Respecto a la relación causal, ésta es un componente imprescindible en una reclamación en daños y perjuicios, ya que "es un elemento del acto ilícito que vincula al daño directamente con el hecho antijurídico." Rivera v. S.L.G. Díaz, *supra*, pág. 422. Del daño culposo o negligente surge el deber de indemnizar que "presupone nexo causal entre el daño y el hecho que lo origina, pues sólo se han de indemnizar los daños que constituyen una consecuencia del hecho que obliga a la indemnización". López v. Porrata Doria, *supra*, pág. 151.

En lo que concierne a la responsabilidad civil extracontractual derivada de actos de mala praxis médica o negligencia del profesional de

la salud, nuestro más alto foro judicial ha establecido que recae sobre los médicos un deber jurídico de cuidado. Dicho deber exige que el galeno proporcione a sus pacientes una atención médica conforme a los conocimientos científicos y técnicos vigentes, teniendo en cuenta los avances contemporáneos en los medios de comunicación y enseñanza, así como las prácticas aceptadas por la comunidad médica, todo ello de acuerdo con los estándares generalmente reconocidos por la profesión. López v. Dr. Cañizares, 163 DPR 119, 132 (2004).

Para establecer un caso *prima facie* de impericia médica se tiene que presentar prueba pericial sobre: **(1) las normas mínimas de conocimiento y diligencia médica aplicables al médico generalista o al especialista, según corresponda; (2) que el demandado incumplió dichas normas en el tratamiento ofrecido; y (3) que tal incumplimiento fue la causa de la lesión alegada por el paciente.** Íd., pág. 134; Rodríguez Crespo v. Hernández, 121 DPR 639, 650 (1988). Por otra parte, al analizar un caso de esta índole, debe tenerse siempre presente que existe una presunción a favor del médico en cuanto a que actuó con un grado razonable de cuidado y brindó un tratamiento adecuado. Arrieta v. De la Vega, 165 DPR 538, 549 (2005). *Véase*, López v. Cañizares, *supra*, pág. 134. En consecuencia, corresponde al demandante la carga de probar que el médico incurrió en negligencia y que dicha conducta constituyó, con el mayor grado de probabilidad, la causa del daño alegado, a los fines de desvirtuar dicha presunción. Rivera v. E.L.A., 99 DPR 890, 899 (1971). Es decir, no es suficiente alegar una mera posibilidad de que el daño se debió al incumplimiento del médico con su responsabilidad profesional. Sucn. Pagán Berríos v. UPR y otros, 206 DPR 317, 330 (2021). *Véase*, Vda. de López v. ELA, 104 DPR 178 (1975).

En línea con lo anterior, es menester aclarar que la presunción que cobija a los galenos debe ser rebatida con prueba pericial. López v. Cañizares, *supra*, pág. 133. En este contexto, el estándar probatorio exigido resulta ser más estricto que el requerido en una acción ordinaria de daños y perjuicios al amparo del Artículo 1802 del Código Civil, *supra*, ya

que la prueba pericial constituye un elemento sumamente relevante, aunque no concluyente. Cirino Vizcarrondo v. Clínica Gubern, 129 DPR 977, 1003 (1992).

Ahora bien, también se ha reconocido la responsabilidad de los hospitales en casos de impericia médica, toda vez que juegan un papel importante en el cuidado de la salud del paciente. Sucn. Pagán Berríos v. UPR y otros, *supra*, pág. 331. En nuestro ordenamiento jurídico, la responsabilidad de los hospitales "ha estado predicada en la doctrina de responsabilidad vicaria". Márquez Vega v. Martínez Rosado, 116 DPR 397, 405 (1985). Por consiguiente, el Tribunal Supremo ha concluido que "las instituciones hospitalarias tienen el deber de ofrecer el grado de cuidado que ejercería [una persona] prudente y razonable en circunstancias similares". Cruz Flores *et al.* v. Hosp. Ryder *et al.*, 210 DPR 465, 487 (2022). Es decir, los hospitales deben ejercer el cuidado y las medidas previsoras que una persona prudente y razonable "desplegaría ante determinadas circunstancias y que ofrezcan a sus pacientes la atención médica que su condición requiera". Blás v. Hosp. Guadalupe, 146 DPR 267, 323 (1998).

En los casos de impericia médica, la parte demandante está en la obligación de establecer, mediante preponderancia de la prueba, que el factor que ocasionó con mayor probabilidad el daño sufrido por el paciente fue el tratamiento médico ofrecido por la parte demandada o la ausencia de proveer el tratamiento indicado y correcto. Íd., pág. 322. Así pues, se ha reiterado que los hospitales y médicos tienen el deber de "ofrecer a sus pacientes la atención que satisfaga las exigencias generalmente reconocidas por la profesión médica a la luz de los medios de comunicación y enseñanza". Núñez v. Cintrón, 115 DPR 598, 613 (1985). Conforme a la doctrina de responsabilidad vicaria, el incumplimiento del precitado deber por el personal del hospital conlleva responsabilidad extracontractual de la institución hospitalaria frente al paciente perjudicado. Íd. Por ello, los hospitales responden vicariamente por sus empleados por actos de mala

práctica profesional respecto a pacientes recluidos en dichas instituciones. Márquez Vega v. Martínez Rosado, *supra*, pág. 405.

En cuanto a la responsabilidad civil extracontractual del personal de enfermería en el tratamiento a un paciente, nuestro máximo foro judicial ha establecido manifiestamente que un enfermero(a) en el ejercicio de su profesión debe ejercitar un grado de cuidado razonable para evitar causar daño innecesario al paciente. Bás v. Hosp. Guadalupe, 146 DPR 267, 306 (1998). Tal nivel de exigencia debe responder al grado de cuidado ejercitado por otras enfermeras de la localidad o en localidades similares. Íd. Dicho de otro modo, en los hospitales del país, los enfermeros tienen el deber insoslayable de realizar y llevar a cabo con el apremio necesario y a tono con las circunstancias específicas de cada paciente, las órdenes médicas aplicables. Núñez v. Cintrón,115 DPR 598, 608-609 (1984),

**B.**

Las Reglas de Procedimiento Civil fueron diseñadas para facilitar el acceso a los tribunales y optimizar cada etapa de dicho proceso judicial, asegurando así, una solución justa, rápida y económica. 32 LPRA Ap. V, R. 1. En sintonía con lo anterior, la Regla 39.2 de dicho cuerpo reglamentario dispone las instancias en las cuales un tribunal puede desestimar las causas de acción presentadas ante su consideración. Respecto a la controversia de autos, el inciso (c) de la mencionada Regla establece lo siguiente:

> Después que la parte demandante haya terminado la presentación de su prueba, la parte demandada, sin renunciar al derecho de ofrecer prueba en caso de que la moción sea declarada "sin lugar", podrá solicitar la desestimación fundándose en que bajo los hechos hasta ese momento probados y la ley, la parte demandante no tiene derecho a la concesión de remedio alguno. El tribunal podrá entonces determinar los hechos y dictar sentencia contra la parte demandante, o podrá negarse a dictar sentencia hasta que toda la prueba haya sido presentada. A menos que el tribunal lo disponga de otro modo en su orden de desestimación, una desestimación bajo esta Regla 39.2 y cualquier otra desestimación, excepto la que se haya dictado por falta de jurisdicción o por haber omitido acumular una parte indispensable, tienen el efecto de una adjudicación en los méritos. 32 LPRA Ap. V, R. 39.2.

Dicho de otro modo, el juzgador tiene la facultad de valorar los elementos probatorios y establecer su propia determinación fáctica, basándose en la fiabilidad que le merezca la prueba presentada. Rivera Figueroa v. The Fuller Brush Co., 180 DPR 894, 916 (2011). En caso de dudas, puede requerirle al demandado que presente su caso. Roselló Cruz v. García, 116 DPR 511, 520 (1985). Al evaluar una solicitud de desestimación bajo este inciso, el tribunal deberá ejercitar un escrutinio sereno y cuidadoso de la prueba. Rivera Figueroa v. The Fuller Brush Co., *supra*; Romero Arroyo y otros v. ELA, 139 DPR 576, 579 (1995). Por último, nuestro máximo foro judicial ha advertido que:

> [D]ada la gravedad de una desestimación de la causa de acción, los tribunales deben ser cuidadosos al atender una moción al amparo de la Regla 39.2(c) pues conlleva el final de la reclamación de un demandante y de su día en corte. Se trata de una decisión que descansa en la sana discreción del tribunal. Rivera Figueroa v. The Fuller Brush Co., *supra,* pág*.* 917*.*

### C.

El Tribunal Supremo tuvo la oportunidad de establecer las distinciones entre un testigo y un perito, y auscultar las categorías susceptibles de reconocerse bajo el concepto de prueba pericial y a qué retribución es acreedor cada perito por su comparecencia en una deposición, en el normativo caso de San Lorenzo Trad., Inc. v. Hernández, 114 DPR 704 (1983).

Consecuentemente, el alto foro define perito como una persona que ha desarrollado un conocimiento o destreza sobre una materia, a través de la educación o experiencia que puede formar una opinión que sirva de ayuda al juzgador. McNeil Healthcare v. Mun. Las Piedras II, 206 DPR 659, 677 (2021); SLG Font Bardón v. Mini-Warehosue, 179 DPR 322, 338 (2010). Además, se ha definido como esa persona entendida o individuo competente e idóneo "por poseer una adecuada capacidad". San Lorenzo Trad., Inc. v. Hernández, *supra*, pág. 709. El conocimiento de este experto, aplicado a la solución de controversias jurídicas, constituye "uno de los medios de prueba personales auxiliadores al desempeño judicial". Íd.

Es norma conocida en nuestra jurisdicción que la necesidad de la prueba pericial está cimentada en la imposibilidad de que un juez, por muy hábil y competente que sea, tenga un conocimiento técnico completo sobre una variedad de materias. Íd., pág. 710. Por tanto, esta necesidad está fundamentada inevitablemente "en la fe y credibilidad humana, ya que ante la ignorancia por parte del juzgador en ciertos aspectos materiales debe imperar un principio de confianza en la palabra del hombre que permita asegurar al Tribunal que su fallo se producirá en justicia". Íd.

Por consiguiente, en cierta manera un perito también es un testigo, pues con su conocimiento o experiencia asiste a los jueces en la labor de poder interpretar materias de cierta dificultad técnica para finalmente adjudicar los hechos de un caso. Claro está, aunque el testimonio pericial y el testimonio de hechos persiguen el mismo propósito, que es el asistir al juzgador de los hechos en la búsqueda de la verdad, sus distinciones han sido claramente definidas. A estos efectos, nuestro más alto foro judicial enumeró las siguientes diferencias importantes entre ambos:

1. El testigo generalmente es casual. Viene en contacto con un hecho o suceso en virtud de una relación extrajudicial de modo accidental, a veces fortuita. Por el contrario, el perito regularmente es seleccionado por una parte o el tribunal. Desconoce los hechos con anterioridad y formula una apreciación con posterioridad al proceso.

2. Los testigos sólo declaran lo percibido por sus sentidos y relatan hechos. El perito intencionalmente los examina y evalúa. Al testigo "se le pide noticias sobre los hechos, al perito se le pide un criterio, una apreciación: del primero se invoca la memoria; del segundo, la ciencia, que es el recuerdo de los conocimientos, o la memoria sistemática". La declaración de un testigo versa sobre "hechos acaecidos o históricos, la del perito [sobre] acaecimientos actuales, e incluso puede aventurar los futuros en base a sus deducciones técnicas. El testigo declara sobre lo que fue objeto de su conocimiento sensorial; el perito dictamina después de haber realizado, con ocasión de ser llamado al proceso, una actividad intelectual perceptiva y deductiva".

3. Como regla general, el testimonio de un perito es reemplazable. El de un testigo presencial de hechos no. Íd., págs. 712-713 (citas omitidas).

Ahora bien, es harto conocido que bajo ciertas circunstancias la figura de un perito y la de un testigo se confunden en una sola. De conformidad con ello, el Tribunal Supremo ha establecido:

> La dicotomía no es absoluta. No encaja siempre en moldes rigurosos. Cabe la posibilidad de que una persona acumule las cualidades de testigo y perito. Tal condición se configura cuando concurren las circunstancias fortuitas de un perito que presencia o participa en un hecho que subsiguientemente es total o parcialmente objeto de una contienda judicial. Nos "hallamos [ante] una doble actividad probatoria de una misma persona: actividad testifical y actividad pericial. Una misma persona actúa como testigo y perito, a través del procedimiento de la prueba de testigos". Íd., pág. 713.

Este tipo de "testigo perito" es un perito que de antemano ha obtenido conocimiento extrajudicial de los hechos pertinentes al litigio, ya sea a través de observaciones directas o por participar en eventos que luego se tornan pertinentes al pleito. Íd., pág. 718. Tal perito ha tenido percepción inmediata de los hechos, por lo que posee información irreemplazable y de ordinario, utiliza su entrenamiento especial o conocimiento técnico para percibir los sucesos que luego son objeto de un litigio. Íd.

A base de lo anterior, la casuística ha establecido tres categorías distintas de peritos, a saber: (1) el perito general, que es el perito clásico que ofrece su opinión experta con respecto a los hechos del caso, pero cuyo testimonio es reemplazable por ser uno de naturaleza técnica; (2) el perito de ocurrencia, quien ha obtenido conocimiento extrajudicial de los hechos relevantes al litigio a través de observaciones directas o por haber participado en ellos; y (3) el perito intermedio, quien en previsión al futuro o durante el procedimiento legal se ha familiarizado con los hechos del caso. Boitel Santana v. Cruz y otros, 129 DPR 725, 731 (1999). Debido a la ausencia de legislación expresa que regule esta materia, se ha entendido que estas categorías pueden servir adecuadamente como un punto de partida para que los tribunales de nuestra jurisdicción puedan identificar y compensar a las personas que reúnen las características que definen al testigo perito y definir el alcance de sus testimonios y el descubrimiento de prueba que se quiere ejercer sobre éstos.

Así, al perito de ocurrencia se le considera un testigo ordinario para todos los efectos. Por lo que están sujetos a descubrimiento de "toda materia no privilegiada y que sea pertinente a la controversia, aunque se trate de una opinión". Rivera Alejandro v. Algarín, 112 DPR 830, 836

(1982). La razón para la amplitud del descubrimiento de prueba es precisamente que se trata de un testigo de hechos.

Si bien un perito de ocurrencia se considera un testigo de hechos, también es considerado su testimonio como uno pericial. Ello se puede concluir de varias expresiones que ha efectuado el Tribunal Supremo en los casos que rigen esta materia. Por ejemplo, en *San Lorenzo Trading* se destacó que el ámbito del testimonio del ingeniero en ese caso estaba limitado a los hechos que percibió éste, según fue rendido en su informe, junto a sus impresiones empíricas y la opinión formada a base de ellas. San Lorenzo Trad., Inc. v. Hernández, *supra*, pág. 719. Por su parte, en *Boitel* se indicó que un médico demandado no podía emitir opiniones periciales sobre el tratamiento brindado por otro médico cuando el primero no participó en los procesos del diagnóstico y tratamiento brindados. Íd., pág. 733.

Por otra parte, la Regla 702 de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 702, dispone que un perito general podrá testificar en forma de opinión o de otra manera cuando su conocimiento científico, técnico o especializado sea de ayuda para que el juzgador pueda entender la prueba o determinar un hecho en controversia. La precitada Regla 702 establece, además, que el valor probatorio del testimonio depende de:

> (a) si el testimonio está basado en hechos o información suficiente;
> (b) si el testimonio es el producto de principios y métodos confiables;
> (c) si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso;
> (d) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica;
> (e) las calificaciones o credenciales de la persona testigo; y
> (f) la parcialidad de la persona testigo. Íd.

Asimismo, la Regla 703 de Evidencia establece que una "persona está calificada para declarar como testigo pericial si posee especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente para calificarla como experta o perita en el asunto sobre el cual habrá de prestar testimonio". 32 LPRA Ap. VI, R. 703.

Nuestro Tribunal Supremo ha determinado que "[a]l momento de catalogar a una persona como perito, **no se requiere que el testigo posea**

**cierto tipo de credenciales académicas o profesionales, pues basta con tener experiencia en la materia particular, que pueda ser de ayuda al juzgador**". Cruz Flores v. Hospital Ryder Memorial Inc., *supra*, pág. 494 (énfasis suplido). **Aun así, se ha dispuesto que, aunque existe liberalidad en cuanto a la capacidad pericial, no quiere decir que la mayor o menor competencia del perito sea irrelevante para apreciar su valor probatorio**. Íd., págs. 494-495. Por ello, no contar con credenciales suficientes puede incidir en el valor probatorio del testimonio pericial. Íd. pág. 495.

En los casos donde versan controversias de impericia médica, "la especialidad de un perito en cierta área puede ser decisiva en cuanto al valor probatorio de su testimonio". Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R., 150 DPR 658, 664 (2000). "**La carencia de especialidad afecta el peso de la prueba pericial, pero no la cualificación", ya que "la especialidad va más al valor probatorio que a la admisibilidad o cualificación pericial**". Íd., pág. 664 (énfasis suplido).

Ante lo expuesto, el Tribunal Supremo ha señalado que, "aunque un generalista y un especialista cualifiquen ambos como perito bajo la [Regla 703] de Evidencia, el especialista está en mejor posición respecto al valor probatorio de su opinión, **pero ello no es factor determinante para la evaluación del testimonio pericial**". Íd., pág. 665 (énfasis suplido).

**D.**

Es norma conocida en nuestro ordenamiento jurídico que, ante la ausencia de error manifiesto, prejuicio, parcialidad o pasión, no se favorece la intervención de los tribunales apelativos para revisar la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el Tribunal de Primera Instancia. Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co., 209 DPR 759, 779 (2022). Al respecto, la Regla 42.2 de las Reglas de Procedimiento Civil dispone que "[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida

consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos". 32 LPRA Ap. V, R. 42.2.

Es decir, un tribunal apelativo no tiene facultad de sustituir por sus propias apreciaciones las determinaciones del foro de instancia. Serrano v. Auxilio Mutuo, 171 DPR 717, 741 (2007). La razón jurídica detrás de esta normativa se fundamenta en la apreciación que hace el adjudicador de los hechos de la prueba testifical, porque al ser una tarea llena de elementos subjetivos, es él quien está en mejor posición para aquilatarla. Sucn. Rosado v. Acevedo Marrero, 196 DPR 884, 917 (2016). El Tribunal de Primera Instancia es el foro que tiene la oportunidad de escuchar el testimonio y apreciar el comportamiento de los testigos. Dávila Nieves v. Meléndez Marín, 187 DPR 750, 771 (2013). Basándose en ello, adjudica la credibilidad que le merecen los testimonios. Así, la declaración directa de un sólo testigo, de ser creída por el juzgador de hechos, es prueba suficiente de cualquier hecho. SLG Rivera Carrasquillo v. AAA, 177 DPR 345, 357 (2009).

A tenor con lo anterior, se le concede respeto a la adjudicación de credibilidad realizada por el juzgador primario de los hechos, dado que el foro apelativo cuenta solamente con "récords mudos e inexpresivos". Trinidad v. Chade, *supra*, pág. 291. No obstante, la norma de deferencia judicial tiene límites y no supone una inmunidad absoluta frente a la función de los tribunales revisores. El Tribunal Supremo aclaró en Dávila Nieves v. Meléndez Marín, *supra*, por primera vez, qué constituye que un juez adjudique con pasión, prejuicio o parcialidad, o que su determinación sea un error manifiesto. Allí se concluyó que un juzgador incurre en pasión, prejuicio o parcialidad si actúa "movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna". Íd., pág. 782.

Por otro lado, se consideran claramente erróneas las conclusiones del foro revisado si de un análisis de la totalidad de la evidencia, el foro

apelativo queda convencido de que "se cometió un error, [...] [porque] las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida". Íd., pág. 772. En otras palabras, incurre en un error manifiesto cuando "la apreciación de esa prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble". Pueblo v. Toro Martínez, 200 DPR 834, 859 (2018).

Por lo tanto, la facultad de los tribunales apelativos para sustituir el criterio de los tribunales de instancia se reduce a aquellas circunstancias en las que, a la luz de la prueba admitida, "no exista base suficiente que apoye su determinación". Gómez Márquez *et al.* v. El Oriental, 203 DPR 783, 794 (2020). Como es conocido, las diferencias de criterio jurídico no cumplen con el referido estándar de revisión. Íd.

**III.**

En el presente caso, los Apelantes nos solicitaron la revocación de la *Sentencia* del TPI mediante la cual se desestimó la "**Demanda**" instada en contra del Hospital, al amparo de la Regla 39.2 (c) de Procedimiento Civil, *supra*.

Como único señalamiento de error esgrimido, los Apelantes sostienen que el TPI erró al declarar "Ha Lugar" la "**Solicitud de Desestimación**" a pesar de que la prueba desfilada justificaba un remedio en ley. Veamos.

Del expediente ante nuestra consideración se desprende que el 22 de noviembre de 2022, los Apelantes presentaron una "**Demanda**" contra el Hospital y otros codemandados por daños y perjuicios, responsabilidad vicaria y daños emocionales. Tras varios trámites procesales, el 12 de marzo de 2024, el Hospital presentó una "**Moción *In Limine***" solicitando la exclusión del testimonio pericial de la señora Regueira Álvarez, alegando que no contaba con la preparación, experiencia ni especialización en el área de salud mental.

El 1 de abril de 2024, el Tribunal limitó el alcance de su testimonio, al determinar que no podía declarar sobre asuntos relacionados con salud

mental ni sobre el manejo de enfermería en unidades de salud mental. Posteriormente, el juicio en su fondo se celebró los días 8 y 9 de diciembre de 2025. Concluida la presentación de la prueba por parte de los Apelantes, el Hospital presentó una "**Solicitud de Desestimación**", al amparo de la Regla 39.2(c) de Procedimiento Civil, *supra*, respecto a la cual el Tribunal se reservó su determinación y ordenó la continuación del desfile de la evidencia.

Finalmente, el 22 de diciembre de 2025, el foro *a quo* emitió una *Sentencia* desestimando las causas de acción instadas en contra del Hospital, al concluir que los Apelantes no presentaron prueba pericial admisible sobre el plan de cuidado, la supervisión y la seguridad requeridos en una unidad de salud mental para un paciente como el señor Oppenheimer García, ni sobre el estándar aplicable de la práctica médica o de enfermería.

Conforme adelantáramos en los acápites anteriores, para establecer un caso *prima facie* de impericia médica, es necesario presentar prueba pericial que demuestre: (1) las normas mínimas de conocimiento y cuidado aplicables al médico generalista o especialista, según corresponda; (2) que el demandado incumplió dichas normas en el tratamiento brindado; y (3) que ese incumplimiento fue la causa de la lesión alegada por el paciente. López v. Cañizares, *supra*, pág. 134; Rodríguez Crespo v. Hernández, *supra*, pág. 650.

Por su parte, un perito es aquella persona que, mediante su educación, experiencia, destrezas o adiestramiento, posee el conocimiento necesario para ayudar al tribunal en la comprensión de asuntos técnicos o especializados. McNeil Healthcare v. Mun. Las Piedras II, *supra*, pag. 677; San Lorenzo Trad., Inc. v. Hernández, *supra*, pág. 709. Sin embargo, no es necesario que el perito tenga una especialidad médica en particular, pues lo importante es que esté capacitado para asistir al juzgador en la controversia. La ausencia de cierta especialidad puede afectar el peso del testimonio, pero no su admisibilidad. Cruz Flores *et al.* v. Hosp. Ryder *et al.*, *supra*, págs. 494-495; Dye-Tex P.R., Inc. v. Royal Ins. Co., *supra*, págs.

664-665. Sobre dicho particular, no podemos pasar por alto las expresiones del Tribunal Supremo al establecer que "**[l]a carencia de especialidad afecta el peso de la prueba pericial, pero no la cualificación**", ya que "**la especialidad va más al valor probatorio que a la admisibilidad o cualificación pericial**". Dye-Tex P.R., Inc. v. Royal Ins. Co., *supra*, pág. 664 (énfasis suplido).

Los Apelantes alegaron que el Hospital actuó erróneamente al no haber establecido un plan de cuidado adecuado en el área de salud mental ni haber provisto los cuidados y medidas de seguridad exigidas para un paciente en las circunstancias del señor Oppenheimer García, dejándolo desprovisto de la atención y los recursos necesarios.

Tras un análisis mesurado y comprensivo del expediente ante nuestra consideración, incluyendo la "**Demanda**", la transcripción de la prueba oral (TPO) y la *Sentencia* apelada, hemos arribado a la conclusión de que el TPI erró al concluir que no se configuraron los elementos de la causa de acción de impericia médica. Nos explicamos.

De entrada, es menester destacar que el hecho de que un médico o profesional de la salud no sea especialista en un área particular dentro de una acción de mala práctica, no incide sobre la admisibilidad de su testimonio pericial, sino sobre el peso o valor probatorio que el tribunal le confiera. R. Emmanuelli Jiménez, Prontuario de Derecho Probatorio Puertorriqueño, 4ta ed., Ed. *Situm*, 2015, pág. 441. En otras palabras, la ausencia de una especialidad no constituye impedimento para declarar como perito en determinada materia, sino que corresponde al juzgador aquilatar el alcance y credibilidad de dicho testimonio. Asimismo, es menester destacar que, si bien nuestra intervención sobre el análisis de la prueba que tuvo ante sí el foro revisado está limitada a ciertos escenarios particulares, lo cierto es que en el caso de la prueba pericial se ha resuelto que estamos en la misma posición que el tribunal de instancia. De hecho, "**[t]enemos plena libertad de adoptar nuestro propio criterio en la apreciación de la prueba pericial**". Díaz v. Pneumatics & Hydraulics, 169 DPR 273, 297 (2006) (énfasis suplido).

En el presente caso, la señora Regueira Álvarez testificó ampliamente sobre sus credenciales académicas y experiencia profesional. Indicó que es profesora en la Universidad de Puerto Rico, específicamente en la Escuela de Enfermería. Además, posee un Bachillerato en Ciencias de Enfermería, así como una Maestría con especialidad en Medicina y Cirugía. Posteriormente, obtuvo un doctorado en *Nursing Sciences* de la Universidad del estado de Massachusetts, el cual completó tras cuatro (4) años de estudios enfocados en investigación, con énfasis en metodologías cualitativas y cuantitativas.

Además de su formación académica, la señora Regueira Álvarez cuenta con una vasta experiencia profesional. Ha ejercido como enfermera en distintos hospitales en Estados Unidos, particularmente en el estado de Massachusetts, y mantiene licencias profesionales en Puerto Rico y en el estado de California. Igualmente, se desprende del expediente que cumple anualmente con rigurosos requisitos de educación continua, completando cursos tanto para mantener su licencia en el estado de California como en Puerto Rico. Asimismo, cuenta con una labor docente que incluye la enseñanza de cursos de investigación y de aspectos legales en enfermería, lo cual refuerza su conocimiento en estándares de cuidado y responsabilidad profesional dentro del campo.

En el ámbito pericial, manifestó haber sido cualificada como perito en múltiples ocasiones, incluyendo una reciente cualificación en el foro federal, apenas dos (2) semanas antes de ofrecer su testimonio en el juicio celebrado ante el TPI. Asimismo, estimó haber participado como perito en más de treinta (30) casos desde el año 2015.[4]

Si bien es cierto que desde antes del inicio del juicio plenario el foro primario limitó el alcance de su testimonio, al determinar que no podía declarar sobre asuntos de salud mental ni sobre el manejo de enfermería en dichas unidades, entendemos que tal determinación fue errónea. Conforme al derecho aplicable, la ausencia de una especialidad en salud mental no la inhabilitaba para rendir un testimonio pericial sobre estándares

---

[4] *Véase*, SUMAC-TA, entrada núm. 27, anejo núm. 1. págs. 5-18.

de cuidado en este tipo de unidad, sino que ello era un asunto que incidía en el peso de la prueba y no en su admisibilidad.

Habiendo aclarado lo anterior, corresponde evaluar si, en efecto, se configuraron los elementos de la causa de acción por impericia profesional. Para que prospere una reclamación de esta naturaleza, es indispensable la presentación de prueba pericial que establezca: (1) las normas mínimas de conocimiento y diligencia aplicables al médico generalista o especialista en cuestión, según corresponda; (2) que el demandado incumplió dichas normas en el tratamiento brindado; y (3) que dicho incumplimiento fue la causa de la lesión alegada por el paciente.

En el caso de autos, la señora Regueira Álvarez testificó sobre las prácticas generales de la enfermería relacionadas con la prevención de caídas y su evaluación del expediente médico del señor Oppenheimer García. Indicó que, como parte del manejo clínico, se realizan evaluaciones de riesgo de caídas al ingreso del paciente y a medida que pasan los días, las cuales permiten determinar si el riesgo es alto, mediano o bajo. Asimismo, explicó que este tipo de documento es de uso común en los expedientes médicos y sirve para identificar la probabilidad de que un paciente sufra caídas durante su hospitalización.

En cuanto al expediente médico específico del presente caso, señaló que al señor Oppenheimer García le realizaron dos (2) evaluaciones de riesgo de caídas, una en sala de emergencias y otra al ingresar a la unidad de salud mental, y que ambas reflejaban que no se le clasificó como de alto riesgo. Sobre ello expresó que no se le asignó la puntuación que correspondía, por lo que el riesgo fue subestimado. En detalle, manifestó su desacuerdo con varios criterios evaluados, como el estado físico y la capacidad de eliminación (si puede utilizar el baño sin ayuda), indicando que no era correcto considerarlo "saludable" ni independiente para ir al baño, dado a que el señor Oppenheimer García presentaba múltiples condiciones de salud, utilizaba silla de ruedas y bastón y tenía amputaciones en ambos pies.

**Además, declaró bajo juramento que el expediente evidenciaba un historial de caídas previo del paciente**. Explicó que, en casos de pacientes con alto riesgo de caída, corresponde al personal de enfermería identificarlo mediante una banda y colocar avisos visibles, así como documentar dichas intervenciones en el expediente. **Sin embargo, indicó que no encontró evidencia de que se hubiesen implementado estas medidas ni de que se hubiera documentado asistencia al paciente para ir al baño**.

Finalmente, señaló otros aspectos que le llamaron la atención, como la ausencia de medidas adicionales de seguridad comúnmente utilizadas, incluyendo sistemas de alerta al levantarse de la cama o el uso de medias o calzado antideslizante. Destacó que, debido a las amputaciones del señor Oppenheimer García, este presentaba problemas significativos de balance, lo que aumentaba su riesgo de caída. Asimismo, indicó que, conforme a las órdenes médicas, el señor Oppenheimer García debía mantenerse bajo observación cercana, lo cual implicaba una supervisión más directa.[5]

A la luz de lo anterior, se demostró que, debido a las circunstancias particulares y el cuadro clínico que presentaba el señor Oppenheimer García, esto es, su desbalance a causa de las amputaciones en sus pies y el uso de silla de ruedas, requería una supervisión más cercana y la implementación de medidas preventivas adecuadas para evitar caídas, las cuales no fueron debidamente provistas. En otras palabras, si bien la perita de los Apelantes no se le permitió testificar sobre el manejo de pacientes en unidades de salud mental propiamente, **lo cierto es que sí testificó sobre los estándares requeridos para prevenir caídas en cualquier institución hospitalaria**. Según su testimonio, efectuar esta evaluación posiciona a toda institución médica a determinar si el riesgo es alto, mediano o bajo. De hecho, su testimonio fue claro al establecer que al señor Oppeheimer García no se le clasificó adecuadamente al no especificarse que era un paciente de alto riesgo de caída, por lo que el riesgo fue subestimado. **Sobre el particular, nos llama poderosamente**

---

[5] *Véase*, <u>SUMAC-TA</u>, entrada núm. 27, anejo, págs. 53-106.

**la atención el hecho de que no se consideró su estado físico ni su capacidad para ser autosuficiente e ir al baño sin asistencia**. De hecho, su expediente revelaba que era un paciente "saludable", cuando utilizaba silla de ruedas y bastón, tenía amputaciones en ambos pies y un historial de caídas previas.

De todo lo anterior, y distinto a la apreciación del foro apelado, concluimos que los Apelantes sí establecieron: (1) las normas mínimas de conocimiento y cuidado aplicables; (2) el incumplimiento de dichas normas por parte del Hospital; y (3) que dicho incumplimiento fue la causa de la lesión alegada por el paciente. López v. Cañizares, *supra*, pág. 134; Rodríguez Crespo v. Hernández, *supra*, pág. 650. Nótese que la señora Regueira Álvarez atestiguó que en este tipo de casos las normas de cuidado aplicables requieren que se identifique al paciente con una banda particular, se coloquen avisos visibles y se documenten dichas intervenciones en el expediente. Sobre dicho estándar, testificó que no encontró evidencia de que se hubiesen implementado estas medidas ni de que se hubiera documentado asistencia al paciente para ir al baño. Es decir, de su testimonio surge amplia prueba de que el Hospital incumplió con los estándares mínimos requeridos en el campo de la enfermería general, por lo que concluir que no se presentó prueba que rebatiera la presunción de corrección del tratamiento es incorrecto en derecho. Habiéndose establecido la negligencia en la enfermería general, sería un contrasentido colegir que no se estableció la negligencia en el campo de la enfermería de salud mental. Así pues, a base de dicho testimonio no nos queda duda de que dicho incumplimiento fue la causa de los daños sufridos por el señor Oppenheimer García que se alegó en la "**Demanda**".

Por el contrario, y en lo pertinente al testimonio pericial del Hospital, notamos que la prueba ofrecida consistiera únicamente de la identificación y cualificación del señor McGinty como perito en temas de *administración de hospitales*. De hecho, el Apelado dio por sometido su caso tan pronto el tribunal *a quo* lo calificó como perito y no presentó prueba adicional. Tampoco efectuó preguntas al señor McGinty que colocaran al Tribunal en

mejor o peor posición para determinar la existencia o inexistencia de negligencia por parte del Hospital o sus empleados en el manejo de sus pacientes, en particular del señor Oppenheimer García. En otras palabras, el Hospital no brindó información alguna que inclinara la balanza del valor probatorio a su favor.

Así pues, resulta forzoso concluir que el personal de enfermería del Hospital incurrió en negligencia al no ejercer el cuidado y las medidas preventivas que una persona prudente y razonable habría desplegado en las circunstancias particulares del señor Oppenheimer García, privándolo de la atención adecuada que su condición requería. Diferimos del criterio de la respetada juzgadora de instancia, puesto que de la evaluación de la prueba pericial presentada surgen las desviaciones desplegadas por el Hospital, en cuanto a cuáles eran las mejores prácticas que se debían implementar con un paciente que presentara el cuadro clínico del señor Oppenheimer García, indistinto de su salud mental. Lo cierto es que los estándares incumplidos por el personal de enfermería del Hospital son aplicables a todo tipo de paciente, por lo que el hecho de que la señora Regueira Álvarez no fuera cualificada como perito en el área de salud mental no era óbice –necesariamente– para descartar de plano su testimonio y concluir que los Apelantes no presentaron prueba preponderante que estableciera la negligencia en este caso.

En suma, luego de examinar la prueba pericial presentada por los Apelantes, somos del criterio que éstos demostraron la negligencia desplegada por el Hospital y concluimos expresamente que el TPI se equivocó al desestimar la "**Demanda**", al amparo de la Regla 39.2 (c) de Procedimiento Civil, *supra*. Es decir, al analizar la TPO en su totalidad, entendemos necesario ejercer nuestra facultad como foro apelativo para sustituir el criterio del TPI, pues a la luz de la prueba admitida, no existe base suficiente que apoye su determinación. *Véase*, Gómez Márquez *et al.* v. El Oriental, *supra*, pág. 794.

Procede, por tanto, devolver el caso al foro primario para que efectúe la correspondiente determinación sobre la valoración de los daños sufridos por los Apelantes.

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte integral del presente dictamen, se *revoca* la *Sentencia* apelada.

Se devuelve el caso al foro de origen para que efectúe la correspondiente valoración de los daños sufridos por los Apelantes, de conformidad con la prueba presentada por las partes durante el juicio, a la luz de lo resuelto en <u>Santiago Montañez v. Fresenius Medical</u>, 195 DPR 476 (2016), y su progenie.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones